

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA** *ex rel.*
**ELEVATION 33, LLC**
1325 G Street NW
Suite 500
Washington, D.C. 20005

*Plaintiffs,*

v.

**GUIDEHOUSE INC.**
1200 19th Street, NW
Suite 700
Washington, D.C. 20036

**Nan McKay and Associates, Inc.**
1810 Gillespie Way
Suite 202
El Cajon, CA 92020

*Defendants.*

**COMPLAINT**

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. §§ 3729** *et seq.*

Civil Action No.

1:22-cv-206 (DNH) (TWD)

## I.   **INTRODUCTION**

1.      As many Americans were facing the ongoing hardship from the COVID-19 pandemic, Congress established the Emergency Rental Assistance Program (ERAP) to provide rental assistance to those who suffered financial hardship from the COVID-19 pandemic. The funds were allocated to the States to distribute to eligible residents.

2.      New York put out an Emergency Request for Proposal in January 2021 to find a vendor to administer New York's ERAP program. New York stressed **"The selected Vendor, ("Vendor" or "Contractor" or "Proposer") must be prepared to mobilize quickly to ensure New Yorkers receive timely and critical rental assistance."** (emphasis in original)

3.      Guidehouse Inc. (Guidehouse) teamed with Nan McKay and Associates (Nan McKay) to answer New York's desperate call. While claiming to have the technical capabilities to deliver such a program, they were not prepared to mobilize quickly; rather, they were interested in cashing in on the pandemic, providing New York with an untested, outdated, unstable, vulnerable, and insufficient solution that left New Yorkers' personal information exposed, delayed relief, and left many eligible New Yorkers without relief at all.

4.      To win the contract, Guidehouse represented to New York that it had a system, namely Nan McKay's system, which was capable of securely and efficiently administering the ERAP contract and that it had the resources to quickly get ERAP funds to applicants quickly based on priority. In fact, Guidehouse did little to no due diligence on Nan McKay's system before winning the contract and in addition, did not effectively estimate the number of resources it needed to quickly disburse funds to eligible applicants. When Guidehouse actually started to operate Nan McKay's system, it quickly realized the system was developed in the early 2010s

and still ran on decade-old technology. Thus, as a sophisticated consulting company with expertise in Government contracting, Guidehouse was aware the system lacked both basic security features and the capability to process applications accurately and efficiently.

5.      Guidehouse hid these failures from New York, falsely certifying the system met the contract's specifications.

6.      While Guidehouse attempted to patchwork an inoperable system, New Yorkers were hurt as Guidehouse profited, receiving tens of millions in fees. Applicants' sensitive personal information was left unprotected. Applicants could not attach necessary documentation, were unable to advance their applications, and often got kicked out of the system. As a result, applications by those most in need floundered, and eligible New Yorkers could not get relief. In an attempt to push funds out quickly, Guidehouse prioritized large institutional landlords over the applicants most in need by focusing on the applicants seeking the largest dollar amounts. This prioritization of large dollar applicants was in clear violation of statutory requirements and guidance posted on New York OTDA's website. Guidehouse's fraud ended up punishing the very people Congress and New York set out to protect with the ERAP program.

7.      Guidehouse made sure to protect its bottom line, earning a 38 percent margin on the $115 million contract, or roughly $43.7 million. Guidehouse is currently seeking additional funds for its contract while only limited dollars remain for the applicants themselves – Guidehouse has requested a $30 million contract extension, but New York only received $27 million after requesting nearly $1 billion in additional funds.

## II.   **PARTIES**

8.      The Relator, Elevation 33, LLC, is a limited liability company organized in the State of Wyoming. Elevation 33, LLC's registered office is 1623 Central Avenue, Suite 18, Cheyenne, WY 82001, and the name of the registered agent at such address is United States Corporation Agents, Inc.

9.      Guidehouse, Inc. is an international consulting company headquartered in McLean, Virginia.

10.     Nan McKay & Associates is a consulting company that focuses on consulting for state and local government entities. Nan McKay headquarters is located at 1810 Gillespie Way, Suite 202, El Cajon, CA 92020.

## III.   **JURISDICTION AND VENUE**

11.     This action arises under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, even had such a public disclosure occurred, Relator would qualify as an "original source" of the information in this Complaint.

14.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they all can be found in this

-4-

District and transact business in this District, including the ERAP contract that is the subject of this lawsuit.

15.    Venue is proper in this District and in this Division pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

## IV.    ERAP PROGRAM

16.    Congress authorized two tranches of funds for rental relief through the Consolidated Appropriations Act of 2021 ($25 billion) and the American Rescue Plan of 2021 ($21.55 billion). These funds were allocated to the 50 States, the District of Columbia, and the various territories and tribal nations.

17.    New York received $1,282,268,820.90 in the first tranche and $1,014,599,304.80 in the second tranche.

18.    The appropriations allowed for administrative costs of up to 10 percent of the funds in the first tranche and 15 percent of the funds in the second tranche.

19.    Under the first appropriation, a household is eligible for assistance if:

  a.   One or more individuals within the household has qualified for unemployment
       benefits or experienced a reduction in household income, incurred significant
       costs, or experienced other financial hardship due, directly or indirectly, to the
       COVID-19 outbreak;

-5-

b.  One or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability; and

c.  the household has a household income at or below 80 percent of area median income.

20.     Under the second appropriation, a household is eligible for assistance if:

a.  one or more individuals within the household has qualified for unemployment benefits or experienced a reduction in household income, incurred significant costs, or experienced other financial hardship during or due, directly or indirectly, to the coronavirus pandemic;

b.  one or more individuals within the household can demonstrate a risk of experiencing homelessness or housing instability; and

c.  the household is a low-income family (as such term is defined in section 3(b) of the United States Housing Act of 1937 (42 U.S.C. 1437a(b))).

21.     In order to benefit those most affected by the COVID-19 pandemic, the appropriations required the prioritization of households with either low income or unemployed individuals.

22.     Further, in order to ensure the funds were used, United States Department of the Treasury (Treasury) recaptured any funds not used by September 30, 2021, and reallocated those funds to any State that had used at least 65 percent of the original grant. The States were therefore incentivized to quickly disburse the aid.

23.     Congress specifically sought to protect applicants' personally identifiable information (PII). The statute specifically required the States to "establish data privacy and

security requirements" that "include appropriate measures to ensure that the privacy of the individuals and households is protected." Consolidated Appropriations Act, Pub. Law No. 116-260, § 501(g)(4), 134 Stat. 2076 (2020).

## V.   NEW YORK'S ERAP RFP AND CONTRACT

24.    On January 13, 2021, New York issued an Emergency Request for Proposal (RFP) that required responses two weeks later on January 27, 2021.

25.    The RFP contained numerous requirements that the contractor provide a secure solution. For instance, one such requirement stated that:

> Contractor and its subcontractor(s) shall utilize industry best practices and technology (including appropriate firewall protection, intrusion prevention tools, and intrusion detection tools) to protect, safeguard, and secure their cloud services systems and NYS Confidential Information against unauthorized access, use, and disclosure. Contractor and its subcontractor(s) shall constantly monitor for any attempted unauthorized access to, or use or disclosure of, any of such materials and shall immediately take all necessary and appropriate action in the event any such attempt is discovered, promptly notifying HTFC of any material or significant breach of security with respect to any such materials.

RFP at § 17 Hosted Services ("Cloud") Requirements and Security at C.

26.    The RFP further required that "[t]he solution shall enable the geocoding of the address of the housing unit for purposes of reporting and data visualization." *Id.* at E-16.

27.    The RFP further required a robust system for receiving and tracking applications including:

   a.  Run section 8 and public housing Verification (data linkage to be provided by HCR)

   b.  Verify Application information with data from external agencies (data linkages to be facilitated by HCR)

    c.   Prioritize Cases

    d.   Assign Cases (both automatically and allow case manager supervisors to make assignments)

    e.   Determine applicant eligibility

    f.   Update information provided by applicant

    g.   Calculate subsidy for approved applications

    h.   Link and access application attachments

    i.   Record and track applicant status

    j.   Provide categories regarding the reasons for a denial.

    k.   Generate approval, denial and case curing notices individually or in bulk

    l.   Process requests for and track appeals

    m.  Enable quality control

    n.   Link landlord W9 submissions in the Landlord Portal with Applications submitted through the Landlord Portal

    o.   Generate payment files

    p.   Receive returned/voided payments and re-issue/adjust payments as necessary

*Id.* at E-1.

28.    New York withdrew the RFP on January 31, 2021. On May 3, 2021, New York awarded the sole-sourced contract to Guidehouse with Nan McKay as a subcontractor.

29.    While the contract specifically requires the use of Nan McKay's system ("Contractor's 'ERAP Application' (which for purposes of this Agreement shall be limited to the solution developed by Nan McKay for the NYS ERAP Program" *Id.* at B)), it makes clear that

Guidehouse is ultimately responsible, stating: "The Contractor shall be solely responsible for the Services under this Agreement. Full responsibility for the delivery of Services provided by another firm which is a subcontractor or vendor to the Contractor must be assumed by the Contractor." Appendix B at ¶11.

30.     The contract contains an 18-page Security and Technology appendix detailing the ways Guidehouse was required to ensure the security of Personally Identifiable Information (PII).

31.     According to this section of the contract, Guidehouse had:

10 business days following execution of the Agreement to review the Existing Policies. To the extent that Contractor reasonably determines that it cannot comply with the Existing Policies, the parties will mutually agree upon: (A)(i) a reasonable timeframe for Contractor to meet such Existing Policies and (ii) the method through which Contractor will meet such Existing Policies, provided that OTDA shall bear all additional costs incurred by Contractor to meet the Existing Policies where such Existing Policies go beyond the requirements under applicable law or industry standards; or (B) an exception to the Existing Policies because they are inapplicable or because there are overlapping requirements with the Existing Policies and OTDA accepts Contractor's proposed approach.

Appendix B-1 Security and Technology § 2.a.

32.     The contract made clear that Guidehouse must safeguard protected information, specifically stating:

Safeguarding of Protected Information shall be an integral part of the business requirements and activities of the Contractor to protect against Information Security Breaches. Contractor shall safeguard the confidentiality, integrity, and availability of Protected Information by complying with the following conditions:

   a.   Implement and maintain appropriate administrative, technical and organizational security measures to safeguard against Information Security Breaches. Such security measures shall comply with industry standard practices and shall, at a minimum, comply with the Existing Policies and must comply with all Applicable Data Law.

b. All Protected Information shall be encrypted at rest and in transit, in accord with, at a minimum, the standard set forth in the Existing Policies all Applicable Data Law and, as appropriate, industry best practices.

c. At no time shall any Protected Information be copied, disclosed, or retained by the Contractor for any purpose other than performing the services under this Agreement.

d. Contractor and Authorized Persons shall not disseminate, use, or permit the dissemination or use of Protected Information in any manner not contemplated by this Agreement without express prior written consent from OTDA.

e. Host all Protected Information and maintain and implement procedures to logically segregate and secure Protected Information from Contractor's data and data belonging to the Contractor's other customers, including other governmental entities.

f. All data center(s) used to perform the services under the resulting Contract must, at a minimum, meet or exceed Tier 3 standards for redundancy and resilience, which can be found at the Uptime Institute website.

g. The Contractor must vet all software solutions and hardware used by Contractor to verify that they are compliant with the requirements set forth by the Existing Policies [NYS-S14-008, as amended] and fulfill the compliance obligations set forth herein for the protection of OTDA's Protected Information. This vetting process shall also extend to all software solutions and hardware used by Authorized Persons.

*Id.* at § 5

33.   The contract further required Guidehouse to swiftly remedy any security breach:

Should an Information Security Incident or a Security Breach occur, immediately following notification to OTDA, Contractor shall 1) promptly investigate and utilize industry standard practices to determine the cause(s) of same, devise a proposed resolution, and report the cause(s) and suggested remedies to OTDA; (2) promptly implement necessary remedial measures, as OTDA deems necessary; (3) document responsive actions taken, including any post-incident review of events and actions taken to make changes in business practices to prevent similar instances

in the future; 4) provide timely updates and reports within the timeframes requested by OTDA: and 5) take any other action as may be directed by OTDA."

*Id.* at ¶ 21.

34.     In order to provide this protection, the contract required Guidehouse to have clear data architecture that identified weaknesses in the system:

> Network architecture diagrams shall clearly identify high-risk environments and data flows that may have legal compliance impacts. Technical measures shall be implemented and shall apply defense-in-depth techniques (*e.g.*, deep packet analysis, traffic throttling, and black-holing) for detection and timely response to network-based attacks associated with anomalous ingress or egress traffic patterns (*e.g.*, MAC spoofing and ARP poisoning attacks) and/or distributed denial-of-service (DDoS) attacks.

*Id.* at ¶ J.

35.     Further, the contract required that "all control, security, and data protection requirements under the Contract must be operational" when the applicant portal was available. Appendix O, Service Levels and Performance Standards at § 4.B.

36.     According to the contract, "Severity Level 1" means the ERAP System and ERAP Application is inoperable, all or in part, or has an extreme impact on End-Users. Examples include: . . . The ERAP System or ERAP Application is in a state where information may be compromised or lost." These incidents had to be addressed within 15 minutes. *Id.* at IX.

37.     The contract also makes clear that the purpose of the program is to resolve applications quickly and efficiently: "It is the intention of the parties to resolve 240,000 applications within four to five months of Program 'Go-live' date." *Id.* at IX.C.1 p. 22. Guidehouse was required to resolve applications efficiently in part by tracking "the current status of all application activity in real-time" with timely follow-up to both applicants and landlords. *Id.*

at VII, p. 13, 15. In sum, New York expected Guidehouse to "work diligently to make sure

transactions are processed accurately." *Id.* p. 16.

38.    The system was required to have specific functionality including:

a.    Provide a secure means for Tenants and Landlords to apply, and for OTDA Authorized Users such as community-based organizations, District staff and other parties acting in the capacity of an authorized representative to apply, on behalf of a Tenant or Landlord.

b.    Provide a secure means for Landlords to provide necessary documents, including but not limited to W-9s and store this information in order to avoid Landlords having to input information multiple times.

c.    Meet all state, federal, and program requirements. Support the collection and matching of all information required by the OTDA Administrative Plan to determine eligibility, process payments in accordance with the OTDA Administrative Plan and applicable state and federal law and guidance promulgated by the federal Department of Treasury, verify identity, verify income, and create and deliver reports (both canned and ad hoc) to meet mandated reporting requirements, effectively manage program operations, and monitor program performance.

d.    Provide Geo-Fencing capabilities and other requested methods of refining application submissions by location, as set forth in the OTDA Administrative Plan.

e.    Flag applications and other issues as required by OTDA Administrative Plan and apply flags regardless of the method used for application submission.

f.    The System must have the capacity to sort applications by priority statuses designated by OTDA in the OTDA Administrative Plan. Applications must be sortable by Household income level as a percentage of Area Median Income (AMI) for household size. Applications must also be able to be sorted by applicant responses to specific questions. For example, if an applicant indicates that they are currently unemployed and have been unemployed for the 90 days preceding the date of application or someone else in the household meets that criteria, the System must have the ability to flag that application so that it may be prioritized. The Contractor shall prioritize applications in accordance with OTDA's business requirements.

*Id.* at II.D.1, 2, 3, 5, 12, 21.

## VI. <u>GUIDEHOUSE UTILIZES NAN MCKAYS OUTDATED SYSTEM</u>

39.     Nan McKay wanted to pursue the contract but knew that it did not have the financial capacity to fulfill the contract's staffing requirements. It therefore partnered with Guidehouse to pursue the contract.

40.     However, once Guidehouse and Nan McKay were finalizing the contract with New York, it became apparent that Nan McKay's system would be insufficient to adequately perform under the contract. Both before and shortly after the contract was awarded, Nan McKay suggested that they should not enter into the contract. However, Guidehouse convinced Nan McKay to continue in order to win and benefit from the lucrative deal.

41.     Chris O'Brien, a Guidehouse partner in charge of Guidehouse's State and Local Government practice, was responsible for the NY ERAP contract, supported by two other partners, Anaita Kasad and Gaurav Menon.

42.     In May 2021, soon after Guidehouse was officially awarded the contract, O'Brien requested that Guidehouse's Cybersecurity practice deploy a cyber security professional. Eugene Okwodu, a director in Guidehouse's Cybersecurity practice, was asked to perform a cybersecurity review of the system for the ERAP contract. O'Brien was aware that Guidehouse was going to use Nan McKay's system, which had previously been used on contracts much smaller than the ERAP program, for example on a contract for relief for the Joplin tornado. However, that contract was only for 400-500 applicants. The New York ERAP contract expected over 100,000 applicants.

43.     Cybersecurity reviews were a standard part of Okwodu's job. The review would always start with a review of the system architecture and associated documentation. The system

architecture is a basic organizational document for any system that describes how the different parts of the system interact and communicate.

44.      Upon requesting the system architecture documentation, Nan McKay responded to Okwodu that no system architecture exists. Okwodu then asked to speak directly to the developer who was responsible for creating and updating the system. Nan McKay stated that the system was 12 years old and that the developer no longer worked at Nan McKay.

45.      This was a significant problem because the contract specifically required network architecture to assist with Guidehouse's cyber security assessments. *See supra* at ¶ 34.

46.      Okwodu became increasingly concerned. Without the system architecture or access to an expert on the system, he had nothing to analyze and no way to confirm if the system was secure. Further, cybersecurity standards have advanced dramatically over the past twelve years. Okwodu found that the system's encryption was hopelessly outdated and failed to meet the modern standards required by the contract.

47.      Under pressure to get the contract operational, O'Brien pressured Okwodu to certify that the system met the contract's cybersecurity requirements because this certification was specifically required for Guidehouse and Nan McKay to begin work on the contract and start reaping the financial reward. Okwodu refused and instead informed his supervisor that he would not work on the contract.

48.      O'Brien then asked Chaz Schaffer, Guidehouse's Chief Information Officer (CIO), for help. The CIO's office is not normally involved in client solutions and instead handles Guidehouse's internal technical needs. Instead, Guidehouse's Cybersecurity practice is the division that regularly assesses cybersecurity compliance on Guidehouse's various contracts.

49.     Schaffer assured O'Brien that his office would handle the cybersecurity analysis for the contract. Schaffer assigned a junior technician to analyze the system. The junior technician began performing some basic checks on Nan McKay's system. By this time, Nan McKay had already accepted a few applications to test the system. The technician searched the internet for these names already in the system and found that they are accessible from the internet and unencrypted—a glaring security breach.

50.     The technician informed Schaffer, who in turn informed O'Brien. On information and belief, Guidehouse did not inform New York State and instead certified that Nan McKay's system meets the contract requirements.

51.     When Guidehouse began taking applications, it quickly realized the system was insufficient to meet the requirements of the contract.

52.     As one example, the system only had three statuses: pending for approval, approved, or denied. It therefore had no way to track where an applicant was in the application process. For example, if an applicant put in new documents, the system had no way to prioritize that application for review. Guidehouse was thus wholly unable to flag applicants that were ready for approval or sort them by priority status for sequencing for approval as required by the contract. *See supra* at ¶ 38 e, f.

53.     In an attempt to put a band-aid on the system's flaws, Guidehouse created workarounds, such as running a query for every applicant with a new document the day before. However, because the system did not track applicants in a sophisticated manner, if an applicant was not captured by the workaround, their application would get lost in the system.

54.     As another example of the basic failures in Nan McKay's system, at the start of the contract it was unable to properly geo-locate applicants. Dan Hudson joined Guidehouse in July 2021 as a director in their data analytics solutions practice. He joined the contract soon after he started at Guidehouse. He was told that the timelines for creating the required functionality on the contract was unrealistic and that trying to build a system on an unrealistic schedule would necessarily lead to errors in development, creating even more problems.

55.     Hudson was tasked with creating a solution for mapping applicants' addresses. The system only mapped addresses based on zip code and did not have the geo-fencing capability required by the contract. *See supra* at ¶ 32 d.

56.     While Hudson was eventually able to create a solution, Guidehouse had been working on the contract for almost two months without the basic capability required by the contract.

57.     These are but two examples of Guidehouse's failures. Within the company, the contract was widely known as a disaster. Guidehouse employees working on the contract frequently left due to the stress caused by the disorganization. Employees regularly yelled at each other, and oftentimes employees were reduced to tears. Guidehouse identified problems almost every day, and when a problem was addressed, Guidehouse would simply identify many more problems lying just under the surface.

58.     Nan McKay would make changes to the system and not communicate the changes to Guidehouse or the other subcontractors. This led to further issues with the system.

59.     Guidehouse was thus operating an inadequate system yet was under tremendous pressure to get essential funding to applicants.

60.     In August 2021, CityLimits published an article indicating that [Governor] "Hochul Pledges to Speed Up Rent Relief, as $115 Million Contractor Struggles to Hit Benchmarks." https://citylimits.org/2021/08/25/hochul-pledges-to-speed-up-rent-relief-as-115-million-contractor-struggles-to-hit-benchmarks/.

61.     The article reported that almost no money had been distributed under the contract and that Guidehouse had issues performing from the start.

62.     Meanwhile, New York regularly informed Guidehouse that they had received $40-$50 million in fees but only had disbursed about $100,000 in assistance. Guidehouse proceeded to ramp up staffing in an attempt to speed up processing, but still could not effectively process applications with Nan McKay's outdated system. Guidehouse ultimately decided on a workaround of prioritizing funds to the largest applicants, which would allow Guidehouse to process the fewest number of applicants for the maximum dollar amount.

63.     Guidehouse wanted to publicly demonstrate large disbursements given the public pressure while also limiting the risk that Guidehouse's delay would lead to Treasury recapturing the ERAP funds and reallocating the funds to other states. However, these large landlords should not have been prioritized over the applicants that had applied first but were unable to complete their applications because of the issues with the system. This resequencing of applicants is contrary to the New York OTDA's website, which states applicants will be prioritized on a first come first serve basis, and failed to meet the statutory requirement to prioritize unemployed and lower income applicants.

64.     But Guidehouse did not fix the problems with the system before it began pushing money out to applicants. Guidehouse did not have sufficient compliance checks to ensure the

recipients were actually eligible. Therefore, ineligible applicants received funds, and landlords were frequently overpaid. The overpayments totaled tens of millions of dollars or more.

65.     Recently, Guidehouse's CEO, Scott McIntyre, bragged about Guidehouse's 38 percent margins on the NY ERAP contract. While Guidehouse failed to meet the needs of New Yorkers on the contract and failed to provide the technical solution it promised while reaping a handsome profit, it is still seeking to continue its fraud, asking for an extension of the contract and an additional $30 million.

## VII.   CLAIMS FOR RELIEF

**Claim for Relief I**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**
**(All Defendants)**

66.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

67.     Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment.

68.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

69.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

Case 1:22-cv-00206-DNH-TWD   Document 1   Filed 03/04/22   Page 19 of 21

70.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay the claims that the Government would not have paid but for Defendants' illegal conduct.

71.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of the False Claims Act (31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**
**(All Defendants)**

72.     Relator incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

73.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

74.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

75.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

### Demand for Jury Trial

76.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby
demands a trial by jury.

### Prayer for Relief

WHEREFORE, Relator, acting on behalf of and in the name of the United States,
demands and prays that judgment be entered in favor of the United States against the specified
Defendants on Counts I, and II of the Complaint as follows:

A.      For treble the amount of the United States' damages, plus civil penalties for each
false claim;

B.      For all costs and fees of this civil action including attorneys' fees;

C.      That Relator be awarded the maximum amount allowed under the FCA; and

D.      For pre- and post-judgment interest and for such other and further relief as the
        Court deems just and equitable.

Dated:   March 4, 2022

                                THOMAS & SOLOMON LLP

                        By:     _____
                                J. Nelson Thomas, Esq. (Bar Roll No. 509525)
                                Jonathan W. Ferris, Esq. (Bar Roll No. 519000)
                                *Attorneys for Relators*
                                693 East Avenue
                                Rochester, New York 14607
                                Telephone: (585) 272-0540
                                nthomas@theemploymentattorneys.com
                                jferris@theemploymentattorneys.com

**BLACK & BUFFONE PLLC**
Samuel J. Buffone, Jr. (*to be admitted pro hac vice*)
John W. Black (*to be admitted pro hac vice*)
Black & Buffone PLLC
1400 Eye St. NW
Suite 200
Washington, D.C. 20005
Telephone: (202) 997-8562
John@blackandbuffone.com
Sam@blackandbuffone.com

*Attorneys for Plaintiff Elevation 33 LLC*